First case for argument this morning 1926 21 South Dakota Donald East v. Minnehaha County et al. Mr. Hendricks. Good morning Your Honor. My name is John Hendricks. I'm the attorney for appellant Donald East and I'm ready to proceed. May it please the court. Yes proceed. Thank you. Your Honor we're here on Mr. East's appeal of the district court's granting of summary judgment motions and a motion to dismiss in favor of the various appellees. We're asking this honorable court to please review the district court's decision and reverse it in all regards. Donald East has presented credible medical evidence that the defendants in this case were deliberately indifferent to a serious medical needs. That evidence includes those defendants own progress notes reports and other medical records. East has established genuine issues of material fact as to whether his constitutional rights guaranteed under the 8th and 14th amendments were violated. There are various appellees in this case. I'm going to address the allegations against each of them very briefly. Dr. Heisler and Nurse Osborne are agents of Correct Care Solutions. Correct Care Solutions is an agency that had a contract with Minnehaha County to offer medical care at the Minnehaha County Jail where Mr. East was incarcerated. Mr. East has had serious issues, medical issues concerning his right foot. These persisted for a number of years on the occasions relevant to Dr. Heisler, Nurse Osborne, and Correct Care Solutions in Minnehaha County. Mr. East was suffering serious wounds or blisters to his right foot. He repeatedly sought medical attention for these. Despite the persistence of these serious wounds, the efforts that were taken by Dr. Heisler and Correct Care Solutions were unavailing. It's our position that Dr. Heisler was deliberately indifferent to how persistent these wounds were and the fact that they were not healing despite the attention that was being paid to them. Dr. Heisler did not refer Mr. East to wound care outside of the jail to the local hospital where he would have received treatment he needed. Ultimately, Mr. East was subjected to amputation of the small toe of his right foot as a result of these wounds and the resulting in the infection that had resulted. How do we find the line between, let's say, a malpractice suit or negligence and deliberate indifference in this case? Because it seems that the record, and I think that Mr. East does not care, the wound care, the attention, several trips to a hospital. How can we tell in this case that this went beyond a claim of malpractice and into a deliberate indifference? Your Honor, I think the record is pretty clear and the record consists very much of the statements of undisputed material facts and statements of disputed material facts from the and correct care solutions downplayed just how serious the condition of his foot was. There are a number of instances in the record where Dr. Heisler and correct care solutions make assertions about the condition of his foot that differ from what they recorded in their own notes and their medical records. And I think that that illustrates the difference between a simple medical malpractice claim and the deliberate indifference standard here. I also think that just the fact that he was an inmate in the county jail and was being treated by Dr. Heisler, and as a result, he was in a more vulnerable position than a number of patients would be, reflects the fact that she was deliberately indifferent. And but primarily it's the circumstantial evidence, particularly the records where he continuously points out that there are issues with his foot, that the infection appears to be proceeding. There are other medical professionals who are examining him, Dr. List and Dr. Smith and various nurses who are pointing out that there's an infection and that it's spreading. And then to refer him outside of the hospital for additional care. So it's really a factual issue, I think. And I think that's one that's ripe for a finder of fact to rule on and was inappropriate for summary judgment. I'm going to continue with regard to Nurse Osborne, who was also an employee of correct care solutions. After the amputation, when Ms. Breach returned to the via a PICC line that was in order to avoid additional infection, Mr. East documented extensive instances of not receiving proper care via that PICC line. At one point, one of the correct care solutions nurses actually dislodged it, resulting in considerable pain. There was an infection that resulted because of the unsanitary conditions surrounding the administration of the medication. Medication was administered in the wrong fashion. The PICC line was set up so that medication could only be administered at a certain speed. But at one point, Nurse Osborne actually administered the medication in just a few minutes, rather than over the half hour that it was supposed to be. The PICC line had to at one point was actually scolded by Nurse Osborne for making complaints after returning from the hospital when the PICC line was replaced. So there were a number of instances and we believe that there is a genuine issue of material fact concerning that. Nurse Osborne was dismissed for failure to locate her. After we made several attempts to locate her and serve her, correct care solutions attorney filed an affidavit from Nurse Osborne. But at that point, it was too late. We did make several attempts to serve her, but we were unable to find a good address. Moving on to our claims against the staff at Mike Durfee State Prison. Shortly after his stay at Mike Durfee State Prison, Mr. East again began suffering problems and severe pain in the same foot. He was referred for medical attention by a podiatrist in Yankton, South Dakota, Dr. Pedersen. Dr. Pedersen detected the fact that he had at least two fractures in that right foot, put a cast on Mr. East and left instructions for the penitentiary that he was to be non-weight bearing for two months and was to be confined to a wheelchair. Contrary to the claims of the appellees, it was not a recommendation, but it's very clear from Dr. Pedersen's note that he was to be non-weight bearing and was to be transported around the grounds in a wheelchair. Nevertheless, when Mr. East returned to the penitentiary, physician's assistant, Anvie, and other penitentiary staff denied him the use of the wheelchair for most of the time, particularly when it was on his unit. He was confined to crutches, which was against Dr. Pedersen's instructions, and as a result, Mr. East actually sprained his ankle. He was sent back to Dr. Pedersen. Dr. Pedersen diagnosed the sprained ankle, also noted that another reason why... Counsel, may I interrupt you? May I interrupt you to ask, because we're getting low on time, would you address the issues against Maker & Goins and particularly the standard we should apply and why that standard favors you? Absolutely. Your honor, I believe that the standard that should apply... I'm sorry, I know it just disappeared. Well, there's a two-step and a one-step. Yeah, and we're asking the court to apply the one-step. We think that the two-step is frankly redundant. Okay, so now how does it favor you? Well, it simply simplifies the analysis. I'm sorry? Please apply it to this case. That's what I'm driving at. Go ahead. I understand. Thank you, your honor. In this case, we believe that the that he did not exhaust administrative remedies because a similarly situated inmate of ordinary firmness would have known under those circumstances that if he brought an administrative complaint against Baker & Goins for their conduct, that there would have been retaliation. And we believe this argument is bolstered by the fact that other inmates in the penitentiary related to him that he would be subject to retaliation. Counselor, are the threats too vague, too general, too normal prison talk? No, I don't think so because they reflect the reality of the prison, quite frankly. And a person in Mr. East's situation isn't going to distinguish between vague or ambiguous threats and direct in-your-face threats. Quite frankly, somebody in Mr. East's position is going to be quite sensibly aware of the context of the threats, the environment, and the circumstances. Is it your position that the step two in the two-step analysis and the solo step in the other one, are those different, the reasonable inmate of ordinary firmness versus a similarly situated individual? Is it your position that that's in any meaningful way different? Well, I think it is different in so far as the first step reflects the current state of the law and what we believe the law should be. The second step just simply replaces an additional burden on the inmate that's really, quite frankly, unnecessary and is already connected to the first step. Well, I guess my point is the first analysis, the one from the third, the ninth, the tenth talks about whether the threat would deter a reasonable inmate of ordinary firmness. And if I understand correctly, the test that you would prefer that we apply is just whether the threats are serious enough to deter a similarly situated individual of ordinary firmness. And my question to you is, do you think that those two set out different standards? I do think that they set out different standards because I think that the test that we prefer allows more leeway for facts to be presented in order for the inmate to establish their position. Counselor, I see you're in your rebuttal. Yes, I am. Were you beginning a question? I just was. Is this quite quickly? No, no, no, no. I didn't mean you. I was looking at Judge Shepard. Go ahead. I'm sorry. No, no, go ahead. Just the similarly situated. Is that the phrase that you're focused on? Correct. Judge Shepard, I apologize. Judge Shepard, you're fine. Counsel, I just have one question. If you had to point to the evidence in the case and pick out your best evidence of a threat that's related to the potential filing of an administrative grievance or complaint, what would it be? Well, I think that it would be the fact that the guards took Mr. East to a isolated place when they made the threats and then actually made the threats and taunted him in an isolated place where it wouldn't be observed by other staff or anybody else. I think a reasonable person in that situation would know that these guards don't want anybody else to know that they're doing this. They did it away. They did it in an isolated place. And then they did it again at the hospital off of penitentiary grounds. Well, I guess I'm asking, what are the words that were used? What were the threats that you would point to? They did not use explicit words, but in the McBride case, I think it's made very clear that if the threats aren't explicit, they don't have to be explicit as long as a reasonable person of ordinary firmness would understand that retaliation for a complaint is a possibility. So they did not use explicit words to dissuade him from making an administrative remedy, but their actions certainly would have done that. Okay, so they took him to an isolated place. What's the non-explicit words or conduct that you would point to? Is that it, taking him to an isolated place? And then threatening him with violence, which an ordinary person would understand that they would not want reported to their superiors. Okay, I think that exalts the question. Mr. Hendricks, we will give you two minutes in rebuttal after the tag team comes along here. I appreciate that. Mr. Murphy, you're first. I think you're muted. I think if you're talking, at least I don't hear you. Thank you for that. May it please the court, counsel. My name is Matthew Murphy. I'm here representing Dr. Jean Heisler, one of the appellees in this matter. This is my first opportunity to have an oral argument before this court, and I'm very honored to be here. Dr. Jean Heisler is a veteran of the medical community in South Dakota. She's been practicing for about 40 years. In relevant part to this case, she was a Center for Family Medicine employee where she was contracted to provide care to Minnehaha County jail inmates for about four to five hours a week. And in that role is where she crossed paths with Mr. East. The appellees in this case have 15 minutes total. I get four. I'm going first because my client's care timeline was at the beginning, and we tried to split this up chronologically. So I'm going to kind of dive right into things. Judge Lang made a very thorough review of the record at the district court level, and he issued a very extensive and reasonable and well thought out decision on this issue. His ultimate determination with regard to my client, Dr. Heisler, was that the evidence even taken in a favor, in a light most favorable to the non-moving party, the plaintiff, did not display the level of deliberate indifference or criminal recklessness that needs to be shown to demonstrate that she acted that way towards a serious medical condition that Mr. East had. This court could affirm his decision based on those grounds, and we would ask that you do so. This court could also affirm his decision on other arguments I've made in the case. The claim against Dr. Heisler is barred by the statute of limitations. The claim against Dr. Heisler does not pass the subjective slash objective test for deliberate indifference in that Dr. Heisler did not have a subjective awareness of an objectively serious medical need, and I think the evidence bears that out in the way she reacted to what she saw during this treatment timeline. And the plaintiff has failed to put forth any medical expert testimony to support the causation or the standard of care elements that should be in this record to demonstrate that my client, Dr. Heisler, acted with deliberate indifference. You agree there could be some obvious, you know, broken leg and bone sticking out stuff that wouldn't require an expert? Yeah, I would. I would, Your Honor. I think in this case, though, you're dealing with osteomyelitis. Dr. Heisler defied that she has seen it two to three times in her 40-year career in a non-diabetic inmate or a non-diabetic patient. It's a rare occurrence. Certainly, he had a blister and it was slow healing. The medical records demonstrate that. But what they also demonstrate is a care team, which included multiple physicians, a nurse practitioner, and nurses seeing him almost every day where they were treating what they saw, and in specific to Dr. Heisler, she saw him on seven or eight occasions during this time period. She consistently made medical judgments as to what needed to be done with regard to his blister. That included changing the wound care that he was receiving, changing the type of gauze that was being used, allowing antibiotics, time to work. And the care team actually used three different types of antibiotics on five different treatment courses. This is not the type of case that your honors have been involved with in the past where there's a clear medical need that's completely ignored. It's not like the Dad versus Anoka case that you wrote, Judge Kelly, or the Williams versus York case. It's more like the cases cited in the brief, the Scott versus Benson case, which I know Judge Shepard and Judge Kelly sat on, the Logan versus Clark case, the Jones versus Minnesota DLC case. Counsel, thank you for your argument. Mr. Tettenborn. Thank you. Thank you. May it please the court, Travis Tettenborn on behalf of the Appley Correct Care Solutions. The district court's order granting some judgment in favor of correct care solutions should be affirmed because the court properly concluded that the facts of Mr. East's medical treatment at the county jail did not meet the well-established standard for deliberate indifference under the Eighth Amendment. CCS did employ the nurses who were providing medical care and treatment to Mr. East each day at the county jail. As it concerns the nurses, there are a few material facts that I'd like to emphasize in my limited time that support the district court's determination under settled principles in the Eighth Circuit. As it concerns the pre-surgery timeline, the record establishes there was no initial delay in Mr. East undergoing evaluation by a physician. He first complained of an issue with his right foot on a Saturday. He was seen that same day by a CCS nurse and he was scheduled to be seen by the district court. From the time that daily wound care was started on Mr. East's right foot and over the course of a five and a half month time frame, CCS nurses provided and documented providing daily wound care, which included unwrapping the covering for the wound, observing the wound, cleaning the wound, and then treating it depending on the physician's orders at the time with either triple antibiotic ointment, petroleum jelly, or a 50-50 mix of hydrogen peroxide and water. And they did this daily. Now Mr. East contends in his briefing that there are three days out of, by my count, a 163-day period in which daily wound care is not documented and therefore it did not occur. Construing this in the light most favorable to Mr. East, this fact is immaterial because 160 out of 163 days of daily observation and wound care treatment does not raise a material question of fact as to whether the nurses were deliberately indifferent to the condition of Mr. East's right foot pre-surgery. Concerning the post-surgery timeline, when Mr. East returned from his six-day hospitalization, he was placed in medical observation housing where he was able to be seen by the nurses each day and they were able to which included two antibiotics, daptomycin and ceftriaxone, or commonly known as Recepin, via his PICC line. They did this once daily. He received the doses as ordered over the course of six weeks. Mr. East was prescribed pain medication initially three times a day and that prescription changed as his complaints changed over the course of the six weeks. Mr. East was given weekly lab draws on every Monday over the course of the six weeks which were altered in accordance with the orders from the specialist that he saw at the local hospital. He was sent to his surgical follow-up appointments as ordered by his specialist and he was sent to the local emergency department three times in the six-week period in response to his various complaints. Overall, over this six-week period, Mr. East was transferred out for... Your time has expired. Mr. Gagan. Thank you. May it please the court, counsel? Due to the obvious time constraints, I don't propose to go into detail as to the specific medical care provided to inmate East following his transfer to the MDSP in April 2014. It seems perhaps the simplest and easiest way to respond to the allegations raised by inmate East would be to do so defendant by defendant. As the court knows, there are, in connection with the medical care provided at MDSP, three names day defendants. They are warden Robert Dooley, unit coordinator Brian Fully and PA Michael Hanvey. Since PA Hanvey is the only health care professional of the three, I would, with the court's permission, start with him. As the district court properly found the claim against Hanvey, and I quote, relates to East's conflict with PA Hanvey over the use of crutches for short-distance transfers instead of the use of a wheelchair for the approximate two-month period when his foot was in the cast. Counsel, you have so little time because the way you've done this argument, which I've never seen in 16 years, you have so little time. Would you please address the test here as to Baker and Goins? Yes, I, the state would advocate that the court adopt the two-part test, subjective and an objective prong. As we've argued in our brief, under the two-part test, in order to satisfy the objective prong, the threat or alleged threat of retaliation has to be shown under circumstances to be reasonable. In this particular case, the state would submit that Mr. East cannot satisfy that burden. I would point out that there is no credible evidence in the record to establish that the alleged threats ever indeed took place. Well, Counsel, Counsel, we assume the fact's favorable to the, to the plaintiff here. Go ahead. Okay, but I would point out the Supreme Court says many cases, go ahead. Right, but the fact of the matter is, inmate East alleges that one of the reasons that he didn't report the alleged threats was out of fear that the institution would either delete or destroy the video evidence. I would like, the state would like to simply point out that by failing to bring the alleged threats to the attention of prison administrators, East denied them the opportunity to either review said videotape in order to preserve the same. Under the objective test, the state would argue that the district court promptly found that inmate East failed to offer any justification for his failure to exercise his administrative remedies. There is no specific reference in the alleged threats that even remotely relate in any way whatsoever to the use of the acknowledges that he frequently contact warden Dooley in reference to his complaints. And at no point, okay, was he ever threatened, okay, retaliation as a result of the use of that grievance process. So you're arguing kind of a causation point. Yes, both that and like, you know, it's probably found by the district court. He didn't satisfy the objective test by putting on evidence. There was no connection between the alleged threats, the alleged actions of Baker and Goins to the grievance process itself. There's no way under the circumstances a reasonable inmate could perceive the alleged statements as a threat not to file a grievance. There's simply no credible connection between the two. And we're not judging credibility here again, but I won't toy with you on that. Your time is expired, Mr. Gegan. And so then we're to Ms. Cook. Ms. Cook. Thank you, Your Honor. Sorry, just waiting for them to give me my minute and 30 seconds. Yeah, it says 030. Ms. Smith, please set it at 130. The clock is not cooperating. We'll spend more than a minute 30 on that, but don't you worry about it. We'll give you the minute 30 somehow, some way. We'll give the people in St. Louis one second to get 130 up there. If it doesn't work, we'll do a minute and we'll guess after that. I even have a cell phone, so it's not impossible for us to do this. Close, but not impossible. I'm happy to do the same, Your Honor. I have very little to say. No, no, no, no, no. Ms. Smith, why don't you set it at a minute and then I'll keep the 30 seconds on the stopwatch here. So, Ms. Cook, go ahead, but realize you're going to get 30 extra seconds. Thank you, Your Honor. Good morning. May it please the court and counsel. My name is Caitlin Cook and I represent Defendant Brad Adams in this lawsuit. The issue to be decided by this court is slightly different than the other defendants in that the issue here is whether the district court erred in dismissing East's complaint against Defendant Adams for failure to state a claim. In looking at East's complaint, it's different as well from the other defendants in that it only has two specific factual allegations with regard to the care provided by Defendant Adams. And even assuming these facts to be true, as is required by the court in determining whether to dismiss a complaint for failure to state a claim, these still cannot sustain a claim for deliberate indifference against Defendant Adams. First, deliberate indifference requires that the Defendant Adams treated him once for ankle pain and once for foot pain, and neither of these are objectively severe in that neither is likely to procure death, degeneration, or extreme pain. Similarly, even if this court were to find that the complaint states an objectively severe medical need, the complaint is completely devoid of any factual allegation to support the and deliberately disregarded that need, and certainly not to the level of criminal recklessness necessary to sustain a claim for this. With that being said, Your Honor, I would respectfully request on behalf of Defendant Adams that this court affirm the ruling of the district court. Thank you. Thank you very much, Ms. Cook, and you're right on time. And so finally, Mr. Gary. Good morning. May it please the court. My name is Bill Gary. I represent Minnehaha County. As I don't mean to repeat, but I will piggyback on the arguments of Dr. Heisler and Correct Care Solutions. But as has been noted, the district court conducted a lengthy and detailed examination of the course of treatment provided to Mr. East at the Minnehaha County Jail and concluded that his care at the jail for any serious medical need failed to meet the deliberately indifference standard. In the absence of any underlying unconstitutional act of deliberate indifference to Mr. East's serious medical needs, while incarcerated at our jail, the county simply cannot be held liable under 1983. And moreover, since Mr. East was not subject to deliberate indifference to the serious medical needs, his complaint for deliberate indifference based on the county's customs practices and policies also fails. And for those reasons, I would again join in the arguments of Dr. Heisler and Correct Care Solutions and respectfully request that this court affirm the district court's grant of summary judgment to Minnehaha County. Thank you very much. Okay, Mr. Hendricks, as I promised you, we will give you two minutes. And so we're back to you. I'm pretty sure. Go ahead. Thank you, Your Honor. With respect to Dr. Heisler's argument that there's no evidence that she had a subjective awareness of the seriousness of the condition, the court can take into consideration Dr. Heisler's access to his the wound care worksheets that obviously demonstrated that the wound was not healing, and the fact that she persistently ignored the clear evidence that his condition was worsening. These were things that were noted by other members of her team, other doctors who were examining Mr. East. One of the nurses indicated as far back as June, a month and a half before he had his surgery, that he should have been seen at the hospital much sooner, but Dr. Heisler was her superior, and so there was nothing that she could do about it. The circumstantial evidence certainly indicates that Dr. Heisler had to have had subjective awareness if she was doing any sort review of his condition. The fact that she continued to treat him and persisted in the same treatment of him is not evidence that she was not subjectively aware of the seriousness of the condition. To say otherwise would be a tautology. The fact that she continued to treat him without taking the extra necessary steps is really what's key here. The necessary declined to do. I also want to take up the Baker and Goins issue very briefly. We think that there is evidence that there was a connection between Mr. East's failure to report their conduct to their superiors and the threats, as evidenced by the fact that Mr. East told his side, I've got to be tough on you, and that will conclude the argument, and case number 19-2621 is submitted for decision by the court. Ms. Smith, please call.